IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GARY SPIKES, o/b/o D.S., | ) | Case No. 1:18-cv-2221 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION** |
| SOCIAL SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Gary Spikes ("Spikes") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental social security income ("SSI") on behalf of his minor child, D.S., under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  Because substantial evidence supported the ALJ's decision and because Spikes has not identified any error of law in the ALJ's evaluation of his claim, the final decision of the Commissioner must be AFFIRMED.

## II.      Procedural History

Spikes applied for children's disability benefits on behalf of his minor child, D.S., on June 23, 2014.  (Tr. 163).[1]  The claim was denied initially and on reconsideration.  (Tr. 182-184, 190-192).  Following a hearing on January 26, 2017, Administrative Law Judge ("ALJ") Scott R.

---

[1] The transcript is filed as ECF Doc. 9.

Canfield denied the claim in a January 3, 2018 decision. (Tr. 12-28). The Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

## III.    Evidence

### A.    Relevant Medical and Educational Evidence

D.S. was born on September 6, 2005. (Tr. 18). He was considered a "school-age child during the relevant time period; he was eight years old when the application for disability was filed and eleven years old at the administrative hearing. (Tr. 116, 164). When D.S.'s mother was pregnant with him, she was reportedly using cigarettes, alcohol and PCP daily. (Tr. 275). Until 2013, D.S. was in the custody of a great aunt. (Tr. 275). Since then, he has resided with his father, Gary Spikes. (Tr. 135). At first, Spikes struggled with maintaining housing, and he and D.S. experienced homelessness for a short while. (Tr. 429). Specialized Alternatives for Families and Youth ("SAFY") assisted Spikes with attaining stable housing. (Tr. 418, 539). In February 2013, D.S. received WISC-IV testing and achieved a full-scale IQ score of 93. His cognitive abilities were in the average range. (Tr. 20, 262).

In 2011, D.S. was diagnosed with attention-deficit/hyper disorder ("ADHD"), rule out disruptive behavior disorders, and disorder of infancy. (Tr. 371, 428). Throughout the alleged period of disability, D.S.'s treating physicians at SAFY, Drs. Spinner and Kemp, prescribed ADHD medications including Vyvanse, Intuniv, and Focalin. (Tr. 371, 428). He was also prescribed Seroquel, a mood stabilizer. (Tr. 633).

Spikes was initially skeptical whether his son needed to take medications every day. However, after receiving repeated phone calls from the school about D.S.'s behavior, he realized the medications were necessary. (Tr. 137-138).

D.S. began mental health treatment with SAFY in 2011. (Tr. 433-434) On January 27, 2014, Spikes reported that D.S. was making progress after going back on medication. D.S. reported having bad dreams. (Tr. 639). In July 2014, after moving with his father, D.S. was having problems with stealing and not being honest about not doing his homework. (Tr. 428-429). He had developed head tics and was taking medications for them. (Tr. 429, 625). He was assigned a global assessment of functioning ("GAF") score of 61. In October 2014, D.S. was cordial and pleasant. Both he and Spikes reported that things were a little better at home and school. D.S. was less fidgety and more focused. However, he still struggled with some adjustment to his new school and paying attention. (Tr. 522).

On November 5, 2014, Michael Faust, Ph.D., performed a consultative examination. (Tr. 360-365). D.S. had a normal appearance but fidgeted in his chair and showed signs of hyperactivity. He was fairly articulate for his age, exhibited normal rate of responding, and did not display any signs of anxiety. He was distracted and required assistance to stay on task. (Tr. 362). D.S. did not display any signs of depression or delusions. He was alert for the examination, completed four digits forward and two backwards, could perform abstract reasoning and his insight and judgment were appropriate for his age. (Tr. 363). Spikes had not given D.S. his medication before the examination so that Dr. Faust could see his behavior without medication. (Tr. 362).

In the area of acquiring and using information, Dr. Faust stated, that D.S. was

likely to have difficulty learning and retaining new information in a group situation due to his ADHD symptoms (he is distracted by his surroundings.) He will require more redirection to sustain focus to the task and given small segments of information to be able to cognitively process and learn didactic information due to ADHD symptoms.

He also found that D.S. had difficulty in the areas of attending and completing tasks and interacting with others. (Tr. 365). In the area of interacting with others, Dr. Faust found that D.S. was likely to "interrupt peers and be disruptive in a group situation as he is impulsive and hyperactive." (Tr. 365). Dr. Faust diagnosed attention deficit/hyperactive disorder. He did not diagnose any other behavior disorder because Spikes said that D.S. was not defiant or oppositional and his acting out behavior was seen as impulsive. (Tr. 364).

State agency reviewing physician, Mark Garner, Ph.D., reviewed D.S.'s records on December 3, 2014 and found that he had less than marked limitations in the domains of attending and completing tasks and interacting and relating with others. He found that D.S. had no limitations in the domains of acquiring and using information, moving about and manipulations of objects, caring for self and health and physical well-being. (Tr. 168). Jeffrey Swain, Psy.D., reviewed D.S.'s records on April 13, 2015 and agreed with the opinions expressed by Dr. Garner. (Tr. 177-181).

D.S. began seeing Janet Kemp, M.D., a psychiatrist, in May 2014. (Tr. 636-637). D.S. complained of head twitches. D.S.'s behavior was fair but he still got into fights with his peers. He still had impulsive behavior but it was manageable. Spikes reported that D.S.'s mood and sleep were good and his appetite was excessive. Mental status examination showed that D.S. was casual and very forthcoming. He had good insight into his medications and symptoms, but he was fidgety and easily distracted. He had no suicidal or homicidal ideation and no psychosis. Dr. Kemp diagnosed ADHD and prescribed Vyvanse and Intuniv. (Tr. 636).

Dr. Kemp saw D.S. on July 24, 2014. She noted that Spikes had taken D.S. off his medications because of the ongoing tics and there was no worsening of behavior. Mental status

examination showed the same findings as at the previous examination. Dr. Kemp noted that D.S. was very polite, engaging and very bright. (Tr. 634).

When D.S. met with Dr. Kemp on April 21, 2015, Spikes reported that D.S. was doing fairly well at home but his teachers had been calling every few days stating that D.S. was not focusing, easily distracted, could not stay on task and had deteriorating impulsivity. Spikes had not given Risperdal except rarely when he had rebound ADHD afternoons. D.S. was sleeping well and had no mood issues. (Tr. 617).

In March 2016, D.S. told his therapist that he missed his father after he had started a new job. (Tr. 439). On April 21, 2016, D.S. and Spikes shared that things had not been going well when his father was working. D.S. had run out of medication and was acting out at school. Spikes had quit his job to be with his son. (Tr. 437).

D.S. attends East Cleveland City Schools. In March 2013, he was evaluated for a "504 Plan" to assess his educational needs. (Tr. 257, 259). Both D.S.'s teacher and guardian[2] opined that he was working below grade level in math. D.S.'s teacher rated D.S.'s total problems, aggressive behavior syndrome, adaptive functioning, conduct problems and externalizing in the clinical range. His scores on the attention deficit/hyperactivity problems and oppositional defiant problems were in the borderline clinical range. (Tr. 261). Both D.S.'s teacher and guardian reported very elevated or elevated concerns in the areas of inattention, defiance/aggression, conduct disorder, and peer relations. (Tr. 273). The team summary stated that D.S.'s teacher was providing math intervention, but D.S. was not making progress with the intervention. (Tr. 274). After the 504 Plan assessment, D.S.'s schooling was accommodated

---

[2] At the time, D.S. was still living with his aunt.

with extra time to complete his math work, behavioral intervention, and techniques to help quell the symptoms that were interfering with his education.  (Tr. 277-278).

D.S.'s fourth grade teacher, Marcia Wallace, completed a teacher questionnaire on March 15, 2015.  Ms. Wallace rated most of D.S.'s interactions and behavior, including his capacity for making and keeping friends, expressing anger appropriately, respecting/obeying adults in authority, seeking attention appropriately, using adequate vocabulary and grammar to express thoughts, and playing cooperatively as "a serious problem."  The evaluation also states that D.S. had a serious problem maintaining relevant appropriate topics for conversation, following rules, and relating experiences.  (Tr. 297).  Ms. Wallace described D.S. as suffering from "anxiety and depression" and as having flash back episodes that made him emotional.  Because of his behavioral issues, Ms. Wallace was struggling with teaching the rest of the class because D.S. was taking up a "substantial amount of classroom time just to control behavior."  She stated that D.S.'s "disability [was] interfering with his access to the general curriculum" and his "depression and anxiety" were "inhibiting his academic growth."  (Tr. 299).

On D.S.'s 2014-2015 report card, his mathematics teacher noted that he needed to memorize basic addition, subtraction, and multiplication facts.  She reported that he refused to participate or do his assignments.  He couldn't follow written directions and asked excessive questions regarding directions.  D.S. was also struggling with reading.  His teacher encouraged him to use reading strategies to increase his comprehension.  She noted that he did not complete his make-up work and had low tests and incomplete work.  (Tr. 327).  His music teacher noted that he needed to follow the music rules and participate.  In the area of social skills, his teacher noted that D.S. needed to remember that there were others in the class and he would have to wait his turn to speak.  (Tr. 328).

D.S.'s 504 Plan was updated in the fall of 2015. The evaluation indicated that D.S.'s ADHD and PTSD continued to affect his ability to learn, think, and concentrate in school. (Tr. 311). He had ongoing struggles with "organizational skills" and "following through with directives and completing tasks without teacher assistance." He also continued to be "very impulsive," which, in turn, caused "him to make poor choices that result in disciplinary action and loss of instruction time." (Tr. 311).

On April 28, 2015, Dr. Kemp completed a questionnaire on D.S.'s medical and functional equivalence. (Tr. 390-393). She marked boxes indicating that he had marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for self. (Tr. 390-391). She did not elaborate on her opinion regarding these domains. She opined that he had moderate limitations in interacting and relating with others and moving about and manipulating objects. He had no limitations in the area of health and physical well-being. She stated that he did not have any side effects from medication and did not have any problem with school attendance. (Tr. 392). She noted that D.S. needed extra time with tests and projects and that he needed tutoring and counseling at home and at school. She opined that his condition was chronic. (Tr. 392).

D.S. was disciplined several times during the 2015-2016 school year. (Tr. 314, 315). D.S.'s fourth referral for discipline occurred on March 7, 2016. D.S. was hitting another student while waiting for the bus. After he got on his bus, he left his backpack and got off the bus to go after the same girl. (Tr. 314).

His report card from 2016 also documents behavioral issues.

[D.S.] does not turn in any homework. He is often off task and disturbing others. His talking and offensive comments are making it difficult for him to interact with his peers in a positive way. These frequent disruptions are affecting his academics. (Tr. 316).

Behavior is very disruptive to the class. Constantly bothers others.

[D.S.] intentionally distracts others in our classes. He will go out of his way to annoy or irritate a peer. [D.S.] wants to do well, but chooses not to control his actions and/or behavior. His behavior and academics have declined. (Tr. 317).

D.S.'s 504 plan was reviewed again in October 2016. (Tr. 340). The team added an accommodation to address D.S.'s frustration and tendency to shut down in order to better address his learning, concentrating and thinking. (Tr. 340). D.S. was given extended time, up to time and a half, to complete assignments in all of his school subjects. (Tr. 353). Despite this, he got a D+ in math and a D- in Science. (Tr. 347).

On October 22, 2016, D.S.'s therapist at SAFY noted that D.S. had made some progress in several areas. However, she also noted that he recently received some failing grades at school and that he appeared to be affected and displayed acting out behavior when his father's job or work hours changed. (Tr. 643-644). D.S. began experiencing tics again and was bullied by his school peers. (Tr. 651). On November 15, 2016, his tic was better but he had been listening less to teachers and was more disruptive in class. The treating psychiatrist increased D.S.'s dosage of Intuniv. (Tr. 657).

On January 24, 2017, Vanessa Ayers, a school counselor, completed a school activities questionnaire. (Tr. 664-665). Ms. Ayers stated that she was not in the classroom with D.S. and that her assessment was based on a survey of his teachers. (Tr. 665). She reported that D.S.'s functioning in all areas was poor; "he is able, chooses not to." (Tr. 664). She noted that D.S. sought attention in negative ways, by being silly and passive aggressive in response to correction. D.S. laughed, talked back, or argued when corrected by teachers. He was often non-compliant. She commented that the "teachers agree that he is completely capable to be

successful in school, however he chooses not to. The teachers have no academic concerns and believe that if he put forth effort he would be an A/B student." (Tr. 665).

**B.    Relevant Testimonial Evidence**

An administrative hearing took place on January 26, 2017. (Tr. 116). D.S. offered the following testimony: He was born on September 6, 2005, was 11 years old and in the sixth grade. He liked school and reported that he got along with his teachers. (Tr. 123).

D.S. explained that he was taking Vyvanse and that it helped him to slow down and concentrate. (Tr. 124). He had not taken his medicine on the day of the hearing. He said he only had two left and he wanted to save them for school. (Tr. 124). D.S. was responsible for taking his own medication. He took Vyvanse before school and Guanfacine in the evenings. He would tell his father when he was close to running out. (Tr. 125). He did not take medication during summer vacation or on the weekends. He said it made him feel like a zombie. (Tr. 126).

D.S. admitted getting in trouble at school for using profanity at recess. (Tr. 128). He reported that the subjects in sixth grade were more difficult and that he seemed to do well in school every other year. (Tr. 128). D.S. liked to be outside. He played football and basketball. (Tr. 129). D.S. took his own shower and picked out his own clothes. (Tr. 130). He also reported keeping his room clean. (Tr. 131).

Spikes also testified during the hearing. Spikes did not know how long D.S. had been diagnosed with ADHD or on medication because D.S.'s aunt had custody of him until 2013. (Tr. 135). Spikes said that D.S. always took his medications except during summer vacation. (Tr. 137). He admitted that, at first, he did not think D.S. needed the medications. However, he learned that he was wrong when he started receiving frequent calls from the school. Spikes began giving D.S. his medication regularly and the phone calls stopped. (Tr. 138).

Even with medication, D.S. still had trouble at school.  He was disruptive and impulsive.  (Tr. 145).  Teachers told Spikes that D.S. was intelligent but he needed to focus more.  (Tr. 146).  He also had issues with completing his homework.  (Tr. 148).  He would lie to Spikes about his homework and other things as well.  (Tr. 151).  Contrary to D.S's testimony, Spikes testified that D.S. did not help clean up and had poor hygiene.  (Tr. 160-161).

D.S. started going to SAFY for psychiatric services when he was five.  (Tr. 150).  D.S. had nightmares from his past .  (Tr. 149).  Spikes believed these were related to D.S. witnessing a murder in 2013 when he was with his mom.  (Tr. 156).  D.S. had also recently reported hearing voices – maybe once a month.  (Tr. 149, 156).  When Spikes reported this to the psychiatrist, he was instructed to take D.S. off of his medications until he could be seen.  However, Spikes continued to give him his medication so that he could go to school.  (Tr. 154-155).  He was waiting for an appointment on January 31st.  (Tr. 154).

Spikes said that D.S. had friends.  However, he had gotten into a couple of fights and kids at school made fun of him because of his tic.  (Tr. 152).  D.S. had been suspended once and had several discipline referrals.  (Tr. 153).

When the ALJ asked Spikes about the consultative examination with Dr. Faust, Spikes said that Dr. Faust did not ask any questions about past trauma or PTSD.  (Tr. 158).

## IV.    The ALJ's Decision

The ALJ's January 3, 2018 decision included the following findings relevant to this appeal:

> 3.  D.S. had the following severe impairment:  attention deficit hyperactivity disorder.  (Tr. 18).
>
> 4.  D.S. did not have an impairment or combination of impairments that met or medically equaled the severity of the criteria for any listed impairment.  (Tr. 18).

5. D.S. did not have an impairment or combination of impairments that functionally equaled the severity of the criteria of the childhood listings. (Tr. 59).

   -   D.S. had less than marked limitations in acquiring and using information. (Tr. 24).

   -   He had marked limitations in attending and completing tasks. (Tr. 25).

   -   He had less than marked limitations in interacting and relating with others. (Tr. 25).

   -   He had no limitations in moving about and manipulating objects. (Tr. 26).

   -   He had no limitations in caring for self. (Tr. 27).

   -   And, he had no limitations in his health and physical well being. (Tr. 28).

Based on all his findings, the ALJ determined that D.S. was not disabled. (Tr. 28).

## V.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The court may not try the case de novo, resolve conflicts in evidence, or independently decide questions of credibility. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997). If supported by substantial evidence and decided under the correct legal standard, the Commissioner's decision must be affirmed even if this court would have decided the matter

differently, and even if substantial evidence also supports the claimant's position. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The standard for evaluating a child disability claim differs from that used for an adult's claim. 42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional

limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner must assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). This is done by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations[3] in two or more domains, or an "extreme" limitation[4] in one domain, the impairments are deemed to functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

---

[3] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." *Id.* "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

[4] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." *Id.* "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

## B.       Treating Physician Rule

Spikes argues that the ALJ erred in assigning less than controlling weight to the opinion of treating physician, Dr. Kemp. He contends that the ALJ did not evaluate whether Dr. Kemp's opinion was supportable and consistent; failed to apply the regulatory factors to determine the proper weight to assign to her opinion; and applied an improperly narrow definition of the children's domains. ECF Doc. 12 at 10. This court's review begins with the treating physician rule.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Here, the ALJ agreed with Dr. Kemp that D.S. had a marked limitation in the domain of attending and completing tasks. However, he found that her opinion that D.S. had marked limitations in the domains of acquiring and using information and caring for self were not supported by the totality of the evidence. (Tr. 22-23). Spikes argues that the ALJ failed to apply the proper factors to determine the weight to be assigned to Dr. Kemp's opinion (ECF Doc. 12 at 14), but it appears that he did apply these factors. (Tr. 22-23). First, the ALJ found that Dr. Kemp's opinion was not supported by her treatment notes. Second, he noted that, when she completed the questionnaire about D.S., Dr. Kemp had been treating him for about eleven months and had only seen him every two to three months. (Tr. 22). Thus, he expressly

considered the length and frequency of the treatment and the supportability of Dr. Kemp's

opinion. To explain his determination that Dr. Kemp's opinion was not supported, the ALJ

discussed each of her four treatment notes from the period before she completed the health care

professional's questionnaire.

> Treatment notes by Dr. Kemp dated **May 8, 2014** noted the claimant was seen at
> home and at school. His behaviors were fair but he still got into fights with peers.
> He still had impulsive behavior but that it was manageable. The claimant's father
> reported his moods were good, along with sleep and appetite. The mental status
> evaluation showed the claimant was very forthcoming. He had good insight into
> his medications and symptoms. His thought process was linear, sharp, but he was
> easily distracted. He had no plans for suicide or homicide and there was no
> psychosis. The claimant was assessed with ADHD and he was prescribed
> Vyvanse and Intuniv. (EX. 5F, pp. 237, 238). Dr. Kemp did not see the claimant
> again until **July 24, 2014**. The Claimant's father took him off the medication
> because of ongoing tics and he had no worsened behavior. It was reported he had
> good moods and a happy disposition most of the time. He obeyed rules. The
> mental status examination showed the claimant was very polite and engaging. He
> was described as very bright. The mental status examination noted the same
> findings as the previous one. (Ex. 5F, p. 235). An examination on **January 13,
> 2015** it was noted the claimant's medication wore off by 6:00 pm and that he was
> hyperactive and silly, but he was always in a good mood. The claimant liked his
> school and that teachers liked him. The mental status examination remained the
> same. His medication Intuniv was changed to Risperdal. (Ex. 5F, p 221). At a
> visit on **April 21, 2015**, this is the first indication that the claimant was noted as
> being hyperactive in school. He was easily distracted, could not stay on task, and
> he had deteriorating grades. The claimant's father reported that he rarely gave the
> claimant the Risperdal. He gave him the medication when he had rebound ADHD
> in the afternoons. (Ex. 5F, p. 218). This was the last time Dr. Kemp saw the
> claimant. (Ex. 5F, p. 205).

(Tr. 22, emphasis added). Based on the foregoing, the ALJ properly found that Dr. Kemp's

treatment notes did not reflect the severe limitations that she expressed in her opinion

questionnaire response. The ALJ considered Dr. Kemp's opinion in compliance with the

regulations and provided good reasons for his decision that her opinion was entitled to limited

weight. Even if the court did not agree with the ALJ's decision, affirmance is still required

because the ALJ's decision was supported by substantial evidence from the record. *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Spikes also argues that the ALJ erred in assigning limited weight to Dr. Kemp's opinion while assigning great weight to the opinion of Ms. Ayers, the school counselor. ECF Doc. 12 at 14-16. He argues that the ALJ should have considered that Ms. Ayers did not examine D.S. and was not with him in the classrooms. Spikes also notes that Ms. Ayers does not have medical training. He argues that the ALJ should not have assigned more weight to Ms. Ayers' assessment than to the opinion of Dr. Kemp.

Vanessa Ayers completed a school activities questionnaire for D.S. At the bottom of the form she stated, "I filled this out and surveyed his teachers as I am not in the classroom with him." Thus, Ms. Ayers did not really submit her own opinion; she reported the statements made by D.S.'s teachers. This is what the ALJ said about Ms. Ayers' questionnaire:

> Vanessa Ayers, school counselor, completed a School Activities Report on January 24, 2017. She reported she knew the claimant for six months. She was a counselor and she commented that she was not in the classroom with the claimant. She surveyed the claimant's teachers and they agreed that he (the claimant) was completely capable of being successful in school. However, he chose not to. The teachers have no academic concerns, and they believed that if he put forth the effort, he would be an A and B student (Ex. 7F).

> The undersigned gives Ms. Ayers' assessment considerable weight because it is consistent with the evidence as a whole. * * *

(Tr. 23). The ALJ acknowledged the limitation in Ms. Ayers' assessment: that it was based on her survey of his teachers – it was not her opinion. He gave it considerable weight because it was consistent with the evidence as a whole. D.S.'s intelligence was in the average range. (Tr. 262). The record showed that D.S. was capable of being successful in school. D.S. testified that he had made the honor roll for one period of school. (Tr. 128). Dr. Kemp noted that D.S. was "very polite, and engaging, very bright, fidgety, silly but easily able to redirect." (Tr. 625). The

ALJ did not reject the opinion of Dr. Kemp because it differed from Ms. Ayers' assessment. The ALJ provided good reasons for assigning limited weight to Dr. Kemp's opinion, and he found Ms. Ayers' assessment compelling because it was consistent with other evidence in the record. The ALJ did not err in weighing the medical opinions in this case.

### C.    Caring for Yourself Domain

Spikes also argues that the ALJ erred in finding that D.S. had less than a marked limitation in the functional domain of "caring for yourself." ECF Doc. 12 at 12. Dr. Kemp opined that D.S. had marked limitations in this domain. In addition to his argument that the ALJ failed to follow the treating physician rule, Spikes argues that the ALJ applied a very narrow definition to reach his conclusion that D.S. did not have a marked limitation in this domain.

A child's disability "functionally equals" the disability Listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(a) & (e)(2). The ALJ found that D.S. had a marked limitation in only one domain - the domain of attending and completing tasks. (Tr. 23-28) Because no extreme and only one marked limitation was found, D.S. was found to not functionally equal the disability Listings. Spikes argues that the ALJ should have also found that D.S. had marked limitations in the domain of caring for self. ECF Doc. 12 at 12-14. The Commissioner counters that substantial evidence supported the ALJ's finding that D.S. had less than marked limitations in this domain. ECF Doc. 14 at 6-8. Because Spikes challenges the ALJ's findings on only one of the six domains, it is unnecessary to address the ALJ's findings on the other five domains.

In the domain of "caring for yourself", an ALJ considers how well a child is able to maintain a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions and living areas.  20 C.F.R. § 416.926a(k).  Relevant portions of the regulations on functional equivalence provide the following guidance:

(1)  General.

(i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence.  The effort to become independent and competent should be observable throughout your childhood.

(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself.  As you mature, using and testing your own judgment helps you develop confidence in your independence and competence.  Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs.  To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions.  Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

The Regulations then set forth age group descriptors for evaluating functional equivalence in the "caring for yourself" domain as well as some examples of limited functioning in that area:

> (iv) School-age children (age 6 to attainment of age 12). You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

The Regulations also provide examples of limited functioning in the domain of caring for yourself:

> (i) You continue to place non-nutritive or inedible objects in your mouth.
>
> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
>
> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
>
> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
>
> (v) You do not spontaneously pursue enjoyable activities or interests.
>
> (vi) You have disturbance in eating or sleeping patterns.

The ALJ found that D.S. had no limitation in his ability to care for himself, stating "[t]he updated evidence shows the claimant still does not have a limitation in this childhood domain. The claimant can perform personal hygiene but he might need some reminders." (Tr. 27).

Spikes argues that the ALJ did not consider the emotional component of this domain. Spikes cites evidence stating that D.S.'s behavior at school was "unacceptable," "unsafe" or harmful to him and that he was "very impulsive" and "oppositional." (Tr. 261, 297, 311, 316, 317, 327, 365, 366). Spikes cites disciplinary measures taken at D.S.'s school (Tr. 314-315) and notes indicating that he was listening to teachers less and being "more disruptive verbally in class."[5] (Tr. 657). Spikes' argument finds support in the record, but so does the ALJ's decision. The ALJ cited evidence in the record supporting his decision, such as the following:

> The claimant testified he did not take his medication on the day of the hearing because he only had two left. He wanted to take the medication when he went to school. He testified the medications help. The testimony also indicated the claimant does not take medication on the weekends or during the summer months. The claimant says the medication makes him feel like a "zombie." He says he gets along with others. He played football and basketball and he was the captain. He can care for his personal hygiene. He can do household chores like cleaning up. He can monitor his medications and report to his father if he needs refills. He is finding the sixth grade schoolwork is challenging.

(Tr. 19-20). D.S.'s testimony showed that he recognized his need for medication and took steps to make sure he would have it when he needed it. (Tr. 123-124). He also testified that he liked school and his teachers. (Tr. 122-123). The ALJ stated that he agreed with Dr. Faust's finding in the domain of self-care. (Tr. 21-22). Dr. Faust stated,

> [D.S.] can complete self-care activities with structure and reminders from father. He often requires redirection when he gets off task. He is independent in toileting and is able to sleep alone. Sleep is reported to be good once he gets to sleep, but he reportedly has difficulty settling down to sleep. He reportedly shows adequate frustration tolerance and father indicates that he is responsive to redirection. He reportedly does not have explosive outbursts or emotional extremes. He reported has no difficulty managing his moods and can transition from one task to another without difficulty.

---

[5] Spikes doesn't cite any evidence that he was putting non-nutritive or inedible objects in his mouth; used self-soothing activities; could not dress or bathe himself; engaged in self-injurious behaviors; or did not pursue enjoyable activities or interests.

(Tr. 365).  The fact that evidence in the record supported Spikes' argument does not negate the fact that the ALJ's decision was also supported by substantial evidence.  An examination of the entire record reveals that substantial evidence supported the ALJ's decision that D.S. did not have a marked limitation in the domain of caring for self and this court must affirm his decision.

### D.       Disruptive Behavior Disorder

Finally, Spikes argues that the ALJ erred by finding that D.S.'s disruptive behavior disorder was not a severe impairment that would impact his domain of interacting and relating with others and caring for self.  ECF Doc. 12 at 17-18.  The ALJ only found one severe impairment – ADHD.  Spikes contends that D.S.'s disruptive behavior disorder should have also been considered to be a severe impairment because it caused more than a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations."  20 C.F.R. § 416.924(c).  Spikes argues that D.S.'s disruptive behavior caused him to exhibit ongoing and persistent disruptiveness, defiance, and aggressiveness that affected his schooling and home life.  Spikes argues that the ALJ's decision of non-severity impacted his finding that D.S. did not have a marked limitation in the domain of caring for self.  However, he does not really explain this argument.

The ALJ found that D.S. had the severe impairment of ADHD.  He noted that the record showed that D.S. had been diagnosed with ADHD and rule out disruptive behavior disorder.  (Tr. 20)  Dr. Kemp's records list disruptive behavior disorder as a "secondary, rule out" diagnosis.  (Tr. 371, 375, 409).  Even if the ALJ had considered this condition to be a severe-impairment, Spikes doesn't explain how that would have made a difference in the ALJ's evaluation of the functional domains.

The Commissioner argues that it is irrelevant that the ALJ did not find that D.S. also had the severe impairment of disruptive behavior disorder.  When an ALJ finds both severe and non-severe impairments, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003); *see also Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. 2008).  As stated above, Spikes doesn't explain how a finding that D.S. had the severe impact of disruptive behavior disorder would have impacted his analysis in the functional domains. Because the ALJ found that D.S. had at least one severe impairment, he proceeded to the next step in the sequential evaluation and he considered the rule-out diagnosis of disruptive behavior disorder throughout the evaluation.  He considered all the evidence including the evidence showing that D.S. displayed disruptive behavior at home and school.  (Tr. 20).  The court finds no error in the ALJ's analysis of the domain of caring for self or in the ALJ's evaluation of the medical opinions.  The court also finds no error in the ALJ's failure to recognize disruptive behavior disorder as a severe impairment.  But even if the conclusion regarding disruptive behavior disorder was erroneous, it was harmless error.  Spikes does not show how a severity finding for this diagnosis would have impacted the ALJ's conclusion that D.S. is not disabled.

## VI.  Conclusion

Because the ALJ's decision is supported by substantial evidence and Spikes has not identified any errors of law in the evaluation of his application for benefits on behalf of D.S., the final decision of the Commissioner is AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: August 22, 2019

Thomas M. Parker
United States Magistrate Judge